UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

I.A.M. NATIONAL PENSION FUND,
NATIONAL PENSION PLAN, *et al.*,

    Plaintiffs,

      v.

TMR REALTY CO, INC., and TOYOTA
LIFT OF NEW YORK, INC.,

    Defendants.

Civil Action No. 04-00594 (CKK)

**MEMORANDUM OPINION**
(March 31, 2006)

Plaintiffs I.A.M. National Pension Fund, National Pension Plan ("the Plan"), and the Plan's

Co-Chair Trustees Warren Mart and Burton C. Trebour ("Trustees") bring this action against

Defendants TMR Realty Co., Inc., and Hi-Lift of New York, Inc., t/a Toyota Lift of New York

("Defendants"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as

amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), *see* 29 U.S.C.

§ 1381, seeking to hold Defendants jointly and severally liable for the withdrawal liability assessed

by the Fund against a non-party, Clarklift of New York, Inc. ("Clarklift"), because they are all

members of the same control group.  Currently before the Court is Plaintiffs' Motion for Summary

Judgment, Defendants' Motion for Summary Judgment, and their related Oppositions and Replies.

Upon a searching examination of the relevant filings, the attached exhibits and declarations, the

relevant case law, and the entire record herein, the Court shall grant Plaintiffs' Motion for Summary

Judgment and shall deny Defendants' Motion for Summary Judgment.

## I: BACKGROUND

*A.     Overview of the Parties*

Plaintiff I.A.M. National Pension Fund, National Pension Plan ("the Plan") was created

under a trust agreement and operates through a joint board of trustees who are equally representative

of labor and management.  *See* Pls.' Mot. for Summ. J., Ex. 1 (Decl. of Alan W. Skolnick

(hereinafter, "Skolnick, Decl.")) ¶ 2.  Plaintiffs Warren Mart and Burton C. Trebour are the Co-

Chair Trustees of the Plan.  *Id.*  The Plan was created by an Agreement and Declaration of Trust,

originally entered into on May 1, 1960, for the purposes of compliance with Section 302(c)(5) of the

Labor Management Relations Act, 29 U.S.C. § 186(c)(5).  *Id.*  The Plan is operated through a joint

board of trustees who are equally representative of labor and management.  *Id.*  A number of

employers contribute to the Plan under the terms of various collective bargaining agreements with

the International Association of Machinists & Aerospace Workers, AFL-CIO, or its affiliates.  *Id.*

As such, the Plan is a multiemployer plan under Section 4001(a)(3) of ERISA, 29 U.S.C. §

1301(a)(3).  *Id.*

Defendant TMR Realty Co., Inc., was incorporated on January 3, 1992.  Pls.' Stmt. of Mat.

Facts Not in Dispute ("Pls.' Stmt.") ¶ 2; Defs.' Resp. to Pls.' Stmt. ("Defs.' Resp.") ¶ 2.  In 2002

and 2003, TMR Realty Co. was located at 20B Central Avenue, Farmingdale, NY 11735.  *See* Pls.'

Mot. for Summ. J., Ex. 2 (TMR's 2002 and 2003 Tax Returns).  Since its inception, 100% of TMR

Realty Co. has been owned by Robert F. Riddle.  Pls.' Stmt. ¶ 3; Defs.' Resp. ¶ 3.  While not a

traditional "holding company," TMR Realty Co. owned 100% of the following domestic

corporations in 2002:  Forklift Headquarters; Clarklift of New York, Inc. ("Clarklift"); Industrial

Material Handling Co. of New York, Inc. ("IMH"), and Defendant Hi-Lift of New York, Inc., t/a

Toyota Lift of New York ("Toyota Lift").  *Id.*  In 2003, TMR Realty Co. owned 100% of these

entities:  Forklift Headquarters; Forklift of New York (d/b/a/ Clarklift); IMH; and Defendant Toyota Lift.  *Id.*

  Defendant Toyota Lift was incorporated on July 12, 1983.  Pls.' Mot. for Summ. J., Ex. 4 (Toyota Lift's 2002 and 2003 Tax Returns).  In 2002 and 2003, Defendant Toyota Lift was located at 20B Central Avenue, Farmingdale, NY 11735.  *Id.*  Since its inception, 100% of Toyota Lift has been owned by Robert F. Riddle.  *Id.*, Ex. 3 (Defs.' Combined Answers to Pls.' First Set of Interrogs., Interrog. Nos. 1 & 2).

  B. *The Merger Agreement and Clarklift's Employer Agreement*

  Clarklift, which is not a part to this litigation, is 100% owned by Robert F. Riddle.  *Id.*, Ex. 3 (Defs.' Combined Answers to Pls.' First Set of Interrogs., Interrog. Nos. 8 & 9); Pls.' Stmt. ¶ 8; Defs.' Resp. ¶ 8.  Clarklift became a contributing employer to the Plan because of the merger of the District No. 15 Machinists' Pension Fund (hereinafter, "District 15 Fund") into the I.A.M. National Pension Fund effective January 1, 1998.  Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl.) ¶ 4; Defs.' Mot. for Summ. J., Ex. 1 (Decl. of Robert F. Riddle and Kevin J. Nash (hereinafter, Riddle/Nash Decl.)) ¶ 12.  Prior to the merger, Clarklift had been a contributing employer to the District 15 fund. *Id.*

  The terms of the January 1, 1998 merger were set forth in an Agreement for Merger of Pension Plans and Program of Relief between the Board of Trustees of I.A.M. National Pension Fund, the Board of Trustees of the District No. 15 Machinists' Pension Fund, and the Pension Benefit Guaranty Corporation ("PBGC").  *Id.* ¶ 3; *see also* Ex. A to the Skolnick Decl. ("Merger Agreement").  Under Article V, Paragraph 4 of the Merger Agreement, the PBGC provided $85.6 million in financial assistance.  *Id.*

Clarklift became bound to the terms of the Merger Agreement and became a contributing employer to the I.A.M. National Pension Fund when Robert F. Riddle signed an Employer Agreement for Merger of Pension Plans and Program of Relief ("Employer Agreement") on June 16, 1998. *See* Pls.' Stmt. ¶ 11; Defs.' Stmt. ¶ 11; *see also* Pls.' Mot. for Summ. J., Ex. B to the Skolnick Decl. ("Employer Agreement"). Under Paragraph 6 of the Employer Agreement, Robert F. Riddle, as President of Clarklift, acknowledged that by signing the Employer Agreement, Clarklift had avoided an immediate assessment of withdrawal liability, a likely increase in its required contribution under ERISA Section 4232, 29 U.S.C. § 1423, and a potential assessment of mass withdrawal liability under ERISA Sections 4209 and 4219(c), 29 U.S.C. §§ 1389 & 1399(c)(1)(D). *See* Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl.) ¶ 7.

By signing the Employer Agreement, Mr. Riddle, on behalf of Clarklift, further agreed as follows:

> Except as expressly provided herein, these rules do not supplant, waive, or alter the application of Title IV of ERISA, including any regulatory, administrative or judicial interpretation thereof. Accordingly, and without limitation, notice, assessment, and collection of withdrawal liability shall be as provided for withdrawal liability under Section 4219, 4221, and 4301 of ERISA. Notwithstanding the foregoing, the undersigned employer hereby waives all rights to request review, demand arbitration, or otherwise challenge any determination of withdrawal liability under ERISA or under this Agreement, including without limitation, the right to challenge the amount and methods of withdrawal liability as set forth herein, which amount and methods shall be final and binding for all purposes.

Pls.' Mot. for Summ. J., Ex. B to the Skolnick Decl. (Employer Agreement) ¶ 5(a)(v). Under this provision, in the event of an alleged withdrawal, Clarklift could challenge whether or not a withdrawal had actually occurred, but waived its right to challenge the Plan's determination of liability, including the amounts and methods upon which the determination was based. *See* Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl.) ¶ 6.

4

On behalf of Clarklift, Mr. Riddle also represented and warranted in the Employer

Agreement that Clarklift

> has full power and authority to enter into this Agreement on behalf of itself and all
> trades or businesses under common control with it, as described in Section
> 4001(b)(1) of ERISA, and this Agreement constitutes a legal, valid, and binding
> contract and agreement for the employer and all trades or businesses under common
> control with it, as described in [S]ection 4001(b) of ERISA, enforceable against
> them in accordance with its terms and applicable law.

Pls.' Mot. for Summ. J., Ex. B to the Skolnick Decl. (Employer Agreement) ¶ 7.

   C.   *The Plan's Assessment and Notice of Withdrawal Liability to Clarklift*

Upon encountering business problems in the late 1990s, Clarklift and IMH effectuated an

internal restructuring and business consolidation involving the re-deployment of mechanics.  *See*

Defs.' Mot. for Summ. J., Ex. 1 (Riddle/Nash Decl.) ¶ 14.  To this end, approximately a dozen or so

Clarklift mechanics then working in Astoria, New York, were transferred, consolidated, and/or

relocated to IMH's facilities on Long Island.  *Id*.  District 15 was formally notified of the Clarklift

internal restructuring under a series of letters, dated August 17, 1999; August 27, 1999; and August

30, 1999.  *Id*. ¶ 15; Defs.' Mot. for Summ. J., Exs. D, E, & F to the Riddle/Nash Decl. (Letters to

IMH).  In furtherance of the relocation, IMH expressly assumed all pension obligations of the

former Clarklift mechanics that were moved to Long Island otherwise owed to the Plan.  *Id*.  This

relocation was done with full knowledge of District 15.  *See id*. ¶ 16; *see also* Defs.' Mot. for

Summ. J., Ex. G to the Riddle/Nash Decl. (6/21/05 Dep. of James Conigliaro, Director for District

15) at 58, 71-73.  District 15 duly recognized IMH's assumption of liability without any imposition

of withdrawal liability.  *See id*. ¶¶ 18-19; *see also* Ex. H to the Riddle/Nash Decl. (10/12/04 Letter

from Douglas D. Menagh, Esq., District 15 attorney, to Defendants' counsel).  Also in recognition

of the internal restructuring, IMH signed a new collective bargaining agreement with District 15

commencing March 1, 2000 and expiring February 28, 2005 (the "CBA").  *See id.* ¶ 20; *see also* Ex. I to the Riddle/Nash Decl. (the CBA).  The CBA expressly recognized that certain employees of Clarklift were now employed by IMH and were eligible for retroactive seniority based upon prior services to Clarklift.  *Id.*

However, the Trustees of the Plan have never designated a union district or local union to act as their agent.  *See* Pls.' Opp'n, Ex. 2 (Second Skolnick Decl.) ¶ 3.  Specifically, the Trustees have never designated District 15 or any of its officers or employees to act as an agent of the Trustees or the Plan.  *Id.*  The Plan is an entity that is legally separate and distinct from District 15, with separate and distinct legal rights and obligations.  *Id.*  As such, the positions taken by District 15 or its officers or employees are not binding on the Plan or the Trustees.  *Id.*  The Plan has consistently held the position that District 15's views or positions regarding Clarklift's transfer of employees to IMH or the Plan's determination of withdrawal liability that is the subject of this litigation are not binding in any way on the Plan or its Trustees.  *Id.*

Accordingly, the national Plan – not the local union, District 15 – determined that, on or about December 31, 2000, Clarklift withdrew under the terms of the Merger Agreement and ERISA, as amended by MPPAA, by permanently ceasing covered operations.  Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl.) ¶ 10.  Article IV, Paragraph 4 of the Merger Agreement sets forth the method for computing withdrawal liability for employers from the District 15 Fund that withdraw after the merger became effective on January 1, 1998.  *Id.* ¶ 5.  Under Paragraph 5 of the Employer Agreement, Clarklift agreed to have its withdrawal liability computed by this method.  *Id.*  Under Article IX, Paragraph 3 of the Merger Agreement, the PBGC affirmed that this method provides terms and conditions for the satisfaction of an employer's withdrawal liability in accordance with

ERISA Section 4224, 29 U.S.C. § 1404.  *Id*.  Clarklift's withdrawal liability assessment was made by the Plan following the terms of the Merger Agreement and the Employer Agreement.  *Id*. ¶ 11.

On October 11, 2002, the Plan sent notice to Clarklift President Robert Riddle of possible withdrawal liability.  *Id*. ¶ 12; *see also* Pls.' Mot. for Summ. J., Ex. C to the Skolnick Decl. (10/11/02 Skolnick Letter to Riddle re: Possible Withdrawal Liability).  The notice advised Clarklift and Riddle that all employees under common control would be treated as a single employer for purposes of withdrawal liability, and requested information about employees under common control.  *Id*.  The Plan received no response to this letter.  *Id*.

On January 3, 2003, the Plan sent notice and a copy of the withdrawal liability calculation to Riddle.  *Id*. ¶ 13; *see also* Pls.' Mot. for Summ. J., Ex. D to the Skolnick Decl. (1/3/03 Skolnick Notice to Riddle) (with attached calculations and return receipt).  The notice was received on January 13, 2003.  *Id*.  The notice advised that the Plan had assessed withdrawal liability in the amount of $8,278,720.00 in 80 quarterly payments beginning March 4, 2003.  *Id*.  The Plan received no withdrawal liability payment in response to this letter.  *Id*.

By letter dated March 5, 2003, the Plan notified Mr. Riddle that Clarklift had failed to make payments as required by the assessment schedule and that, if the delinquency was not rectified immediately, the entire amount would be due and payable.  *Id*. ¶ 14; *see also* Pls.' Mot. for Summ. J., Ex. E to the Skolnick Decl. (3/5/03 Notification of Failure to Make Payment When Due Letter) (with return receipt).  Once again, the Plan received no withdrawal liability payments in response to this letter.  *Id*.

Finally, by letter dated June 6, 2003 and received on June 12, 2003, the Plan notified Mr. Riddle that Clarklift was in default within the meaning of ERISA Section 4219(c)(5), and

demanded immediate payment of $8,278,720.00, the entire amount of the withdrawal liability, plus

interest accrued thereon in accordance with ERISA Section 4219(c)(5).  *Id.* ¶ 15; *see also* Pls.' Mot.

for Summ. J., Ex. F to the Skolnick Decl. (6/6/03 Notification of Default) (with return receipt).  The

Plan received no withdrawal payments in response to this letter.

As of this date, no entity – including Defendants TMR Realty Co. and Toyota Lift – has

made any payment of withdrawal liability to the Plan.  *Id.* ¶ 17.  In addition, prior to the initiation of

this lawsuit by Plaintiffs on April 12, 2004, *see* Compl. at 1, neither Clarklift nor any of its control

group members – including Defendants TMR Realty Co. and Toyota Lift – sought plan review or

attempted to initiate arbitration of the withdrawal liability in accordance with ERISA Sections 4219

or 4221, 29 U.S.C. §§ 1399 & 1401.  *Id.* ¶ 16.  In the instant action, filed pursuant to 29 U.S.C. §

1381, Plaintiffs seek to hold Defendants TMR Realty Co. and Toyota Lift jointly and severally

liable for the withdrawal liability assessed by the Fund against non-party Clarklift because they are

all members of the same control group.  *See* First Am. Compl.[1]

### D.     *The Contemporaneous Bankruptcies of Clarklift and IMH*

*After* the Plan's determination of withdrawal against Clarklift but *prior to* its assessment and

notice of withdrawal liability to Riddle, the President of Clarklift, Clarklift and IMH sought Chapter

---

[1] Plaintiffs' original Complaint in this action named "Toyota Lift of New York, Inc." as the
co-defendant alongside TMR Realty Co.  *See* Compl. at 1.  Plaintiffs were obviously confused by
the trading name held out to the public, as Toyota Lift is incorporated under the name "Hi-Lift of
New York, Inc."  Defendants sought dismissal of "Toyota Lift of New York, Inc.," contending that
Plaintiffs had named an incorrect, nonexistent party.  *See* Defs.' Mot. for Summ. J. at 9; Defs.'
Opp'n at 3-4.  Plaintiffs opposed this argument and filed a concurrent Motion to Amend the
Complaint.  In a ruling dated March 6, 2006, the Court granted Plaintiffs leave to amend.  *See*
I.A.M. Nat'l Pension Fund v. TMR Realty Co., Civ. No. 04-594 (D.D.C. Mar. 6, 2006)
(memorandum opinion granting leave to amend).  On March 6, 2006, Plaintiffs formally filed their
First Amended Complaint correctly naming Hi-Lift of New York, Inc., t/a Toyota Lift of New York,
as a Defendant.  Defendants submitted an Answer to Plaintiff's First Amended Complaint on March
15, 2006.

11 relief on July 5, 2001 as related debtors.  *See* Defs.' Mot. for Summ. J., Ex. 1 (Riddle/Nash

Decl.) ¶ 21; *see also* Ex. A to the Riddle/Nash Decl. (Chapter 11 Voluntary Petition).  Originally

Case Nos. 01-18994(CEC) and 01-18997(CEC) in the United States Bankruptcy Court, Eastern

District of New York, these cases were procedurally consolidated pursuant to notice on January 18,

2002.  *Id.*; *see also* Ex. J to the Riddle/Nash Decl. (1/19/02 Consolidation Order).

 Based upon IMH's assumption of Clarklift's pension obligations, the Plan was scheduled by

IMH as a priority creditor for unpaid pre-petition pension contributions as part of the IMH

bankruptcy.  *Id.* ¶ 22; *see also* Ex. K to the Riddle/Nash Decl. (IMH's Sechedule E Priority

Creditor List).  Throughout the bankruptcy proceedings, various notices were given to the Plan,

including notice of the rescheduled first meeting of creditors and the September 10, 2002 Bar Date.

*Id.* ¶ 23.  Plaintiffs admit that (1) they received notice of the bankruptcies of Clarklift and IMH; (2)

they never obtained leave of the Bankruptcy Court to serve any notices on Clarklift for alleged

withdrawal liability after the bankruptcy filing; and (3) they never filed any proof of claims for

withdrawal liability or otherwise during the course of the bankruptcy proceedings.  Defs.' Stmt. ¶¶

16-18; Pls.' Resp. ¶¶ 16-18 (not disputing, but contending these facts are immaterial).

 Conversely, District 15 filed two separate proofs of claim in the respective sums of $4,218

(Local 447 Fringe Benefit) and $38,577 (District 15 Health Fund) during the bankruptcy

proceedings.  Defs.' Stmt. ¶ 19; Pls.' Resp. ¶ 19 (not disputing, but contending these facts are

immaterial).  After certain adjustments, both of these claims were paid in full.  Defs.' Stmt. ¶ 20;

Pls.' Resp. ¶ 20 (not disputing, but contending these facts are immaterial).  Moreover, the proofs of

claim filed by District 15 included certain former Clarklift workers who became employed by IMH

as part of the pre-bankruptcy internal consolidation.  Defs.' Stmt. ¶ 21; Pls.' Resp. ¶ 21 (not

disputing, but contending these facts are immaterial).

The reorganization proceedings of Clarklift and IMH were successful, as plans of reorganization were ultimately confirmed on July 10, 2003, pursuant to an Order dated July 24, 2003.  Defs.' Stmt. ¶ 22; Pls.' Resp. ¶ 22 (not disputing, but contending these facts are immaterial). Defendants TMR Realty Co. and Toyota Lift did not declare Chapter 11 bankruptcy; however, TMR Realty Co. was a co-proponent of each of the respective plans of reorganization filed by Clarklift and IMH.  Defs.' Stmt. ¶ 23; Pls.' Resp. ¶ 23 (not disputing, but contending these facts are immaterial).  As a co-proponent, TMR was discharged from all unsecured claims that could be asserted against IMH pursuant to the provisions of Article VI, which provided in relevant part:

> 6.1.  The holders of Class 4 Unsecured General Claims . . . shall receive a cash dividend equal to thirty-five (35%) percent of their Allowed Claims from the Exit Fund on the Effective Date hereof in complete satisfaction, release and discharge of all existing claims, causes of actions, demands or rights to payment against the Debtor [Clarklift and IMH, respectively], the Reorganized Debtor, the Proponents [TMR Realty Co. and Robert F. Riddle] or the Debtor's Estate arising prior to the Effective Date hereof.

Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization) ¶ 6.1; *see also* Defs.' Stmt. ¶ 24; Pls.' Resp. ¶ 24 (not disputing, but contending these facts are immaterial).  Likewise, the respective plans also provided that property of Clarklift and IMH would be vested post-confirmation in the recognized debtors, "or, if permitted by the Bankruptcy Court transferred to TMR in furtherance of a merger of the companies, free and clear of all pre-confirmation lies, claims and interests . . . ."  Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization) ¶ 9.2; *see also* Defs.' Stmt. ¶ 25; Pls.' Resp. ¶ 25 (not disputing, but contending these facts are immaterial).

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment."  *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

The Court shall begin its analysis by first examining the Plan's "affirmative" case against Defendants TMR Realty Co. and Toyota Lift.  Specifically, the Court shall look at (1) whether non-party Clarklift was assessed withdrawal liability; (2) whether the control group members – i.e., Defendants – are equally liable for Clarklift's withdrawal liability; and (3) whether notice to Clarklift constituted notice to control group members TMR Realty Co. and Toyota Lift.  The Court shall then redirect its inquiry, turning to an investigation of Defendants' various defenses.  Under this prong, the Court shall address (1) Defendants' argument that Clarklift never withdrew from the Plan, and that an assessment of withdrawal liability is therefore improper; and (2) Defendants' contention that the Clarklift and IMH plans of reorganization, coupled with the principle of *res judicata*, relieve Defendant TMR Realty Co. of possible liability in this matter.

A.    *Plaintiffs' Affirmative Case Against Defendants TMR Realty Co. and Toyota Lift*

1.    Clarklift Was Assessed Withdrawal Liability

Prior to the merger of I.A.M. District No. 15's Pension Fund into the I.A.M. National Pension Fund, Clarklift was obligated to contribute to the I.A.M. District 15 Plan.  *See* Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl) ¶¶ 3-4.  As a result of the January 1, 1998 Merger Agreement and Clarklift's concomitant execution of a separate Employer Agreement on June 16, 1998,

Clarklift became obligated to contribute directly to the Plaintiff Plan. *Id.* ¶ 4.  The Merger

Agreement and Clarklift's separate Employer Agreement also expressly provided that Clarklift

would be subject to the assessment of withdrawal liability if it withdrew from the Plan. *Id.* ¶ 5.

In this case, the Trustees determined that Clarklift withdrew from the Plan effective

December 31, 2000. *Id.*  Under ERISA, an employer incurs a complete withdrawal from a

multiemployer pension plan when it permanently ceases all covered operations under the plan or

ceases to have an obligation to contribute to the plan. *See* 29 U.S.C. § 1383(a) (ERISA Section

4203(a)).  Upon withdrawal, an employer is liable for its allocable share of the plan's unfunded

vested benefits. *Id.* § 1381(b) (ERISA Section 4201).  A plan's unfunded vested benefits are those

to which employees have become legally entitled, but which have not been fully funded. *See*

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602,

609, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (defining "unfunded vested benefits" as "the

difference between the present value of vested benefits (benefits that are currently being paid to

retirees and that will be paid in the future to covered employees who have already completed some

specified period of service, 29 U.S.C. § 1053) and the current value of the plan's assets, 29 U.S.C.

§§ 1381, 1391") (quoting *Pension Benefit Guar. v. R.A. Gray & Co.*, 467 U.S. 717, 725, 104 S.Ct.

2079, 81 L.Ed.2d 601 (1984)) (internal quotation marks omitted); *see also* 29 U.S.C. §§ 1381,

1391 (ERISA Sections 4201 and 4211).  The Trustees made this withdrawal determination based

on Clarklift's cessation of contributions for its covered employees and determined its withdrawal

liability pursuant to the Merger Agreement and Clarklift's Employer Agreement. *See* Pls.' Mot. for

Summ. J., Ex. 1 (Skolnick Decl) ¶¶ 10-11.[2]

---

[2] Under the terms of the Merger Agreement and the Employer Agreement, withdrawal
liability determinations for former District 15 employers are made as if the District 15 Plan had

When a plan determines that an employer has withdrawn and computes the amount of its liability, it notifies the employer and demands payment. *See* 29 U.S.C. §§ 1401, 1399(b)(1) (ERISA Sections 4221 and 4219(b)). This "notice and demand" triggers a requirement that the employer begin paying its withdrawal liability in installments within 60 days. Moreover, it also triggers a 90-day deadline for the employer to request the plan sponsor to review the assessment of liability. *See* 29 U.S.C. § 1399(b)(2)(A) & (c)(2) (ERISA Sections 4219(b)(2)(A) & (c)(2)). Thereafter, the employer must initiate arbitration within a maximum of 180 days from the date of its request for review. *See* 29 U.S.C. § 1401(a)(1) (ERISA Section 4221(a)(1)). If arbitration is not initiated by the employer, the employer's withdrawal liability is "due and owing" according to the schedule set forth in the notice and demand. *See* 29 U.S.C. § 1401(b)(1) (ERISA Section 4221(b)(1)). If the employer thereafter defaults on its scheduled payments, the plan may accelerate the principal amount of the employer's withdrawal liability upon 60 days' notice and sue for that amount, plus interest, liquidated damages, and attorney's fees. *See* 29 U.S.C. § 1399(c)(5)(a) (ERISA Section 4219(c)(5)(a)).

Here, the Plan sent a series of letters to Clarklift's president and sole shareholder, Robert F. Riddle, regarding Clarklift's withdrawal liability, and the implications for its control group members. In the first letter, sent on October 11, 2002, the Plan Office advised Riddle that Clarklift may have partially or completely withdrawn from the Plan as of December 31, 2000, and sought additional information about the withdrawal and control group pursuant to ERISA Section 4219(a). *See* Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl.) ¶ 12; *see also id.*, Ex. C to the Skolnick Decl. (10/11/02 Skolnick Letter to Riddle re: Possible Withdrawal Liability) (citing 29 U.S.C. § 1399(a)

---

remained a separate plan. *See* Pls.' Mot. for Summ. J., Ex. A to the Skolnick Decl. ("Merger Agreement") at Article IV ¶ 4; *id.*, Ex. B to the Skolnick Decl. ("Employer Agreement") at ¶ 5.

(ERISA Section 4219(a))) ("[A]n employer shall, within 30 days after a written request from the plan sponsor, furnish such information as the plan sponsor reasonably determines to be necessary to enable the plan sponsor to comply with the requirements of this part.").  The Plan received no response to its inquiry; as such, by letter dated January 3, 2003, the Plan sent its official "notice and demand" of withdrawal liability to Clarklift and Riddle, demanding payment for withdrawal liability of $8,278,720.00, payable in 80 quarterly installments of $188,855.00 or 20 installments of $755,421.00 beginning March 4, 2003.  *Id.* ¶ 13; *see also* Pls.' Mot. for Summ. J., Ex. D to the Skolnick Decl. (1/3/03 Skolnick Notice to Riddle).  Neither Clarklift, Riddle, or any member of Clarklift's control group requested a review of the Plan's determination within the 90-day statutory period prescribed by ERISA Section 4219, *see* 29 U.S.C. § 1399(b)(2)(A) & (c)(2), or demanded arbitration pursuant to ERISA Section 4221, *id.* § 1401(a)(1).  *See* Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl.) ¶ 16.  Accordingly, Clarklift's withdrawal liability became "due and owing" on March 4, 2003 pursuant to the schedule set forth in the Plan's January 3, 2003 notice and demand. *See* 29 U.S.C. § 1401(b)(1) (ERISA Section 4221(b)(1)).

When no payment was received, the Plan notified Riddle by letter dated March 5, 2003 that (1) it had not received the first payment, and (2) that failure to pay according to the schedule could accelerate all payments.  *See* Pls.' Mot. for Summ. J., Ex. 1 (Skolnick Decl.) ¶ 14; *see also id.*, Ex. E to the Skolnick Decl. (3/5/03 Notification of Failure to Make Payment When Due Letter).  Once again, having received no response, the Plan notified Riddle on June 6, 2003 that it still had not received any payments and that Clarklift was therefore in default such that the entire amount was then due and owing in accordance with 29 U.S.C. § 1399 (ERISA Section 4219).  *Id.* ¶ 15; *see also* Pls.' Mot. for Summ. J., Ex. F to the Skolnick Decl. (6/6/03 Notification of Default) (with return receipt).

15

As such, it is clear that the Plan followed the proper and required procedures in assessing withdrawal liability against Clarklift.  While the Court shall discuss the impact of Clarklift's concurrent Chapter 11 bankruptcy on this assessment at a later point, *see infra* Section III(B)(2)(a), as an initial matter the Court finds that the steps undertaken by the Plan in assessing withdrawal liability were concomitant with its obligations under ERISA.  However, the effect of this assessment against Clarklift on other members of its control group – namely, Defendants TMR Realty Co. and Toyota Lift – must now be examined.

      2.    <ins>Defendants TMR Realty Co. and Toyota Lift Are Members of a Control Group with Clarklift, and Are Therefore Jointly and Severally Liable for Clarklift's Withdrawal Liability under ERISA</ins>

Importantly, the withdrawal liability provisions of ERISA apply to all members of a control group as a single employer.  Each member of the control group is joint and severally liable for the purposes of withdrawal liability pursuant to ERISA Section 4001(b)(1), which specifically provides:

> For the purposes of this title, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses [shall be treated] as a single employer.

29 U.S.C. § 1301(b)(1).  The PBGC's regulation provides that it will determine if trades or businesses are under common control as defined in regulations prescribed under Section 414(c) of the Internal Revenue Code and the regulations thereunder.  *See* 26 U.S.C. § 414(b)-(c); 29 C.F.R. § 2612.2.  Those regulations, in turn, define three types of controlled groups:  (1) parent-subsidiary; (2) combined; and (3) brother-sister.  *See* 26 C.F.R. § 1.414(c)-2 (Treas. Reg. § 1.414(c)-2).  In this case, Defendants TMR Realty Co. and Toyota Lift can be considered as members of a control group with Clarklift under both a brother-sister theory and a parent-subsidiary theory.

With respect to a "brother-sister" control group, the regulations provide that if the same five

or fewer people own both a *controlling interest* in, and *effectively control* the same group of businesses, such businesses will be considered a commonly controlled "brother-sister" group of businesses. *Id.* § 1.414(c)-2(c) (Treas. Reg. § 1.414(c)(2)-2(c)). For the purposes of the control group regulations, in the case of a corporation, a "controlling interest" is defined to constitute ownership of 80% of more (by value or voting power) of the corporation's stock. *Id.* § 1.414(c)-2(b)(2)(A) (Treas. Reg. § 1.414(c)-2(b)(2)(A)). "Effective control" is defined under the regulations as ownership of more than 50% (by value or voting power) of the corporation's stock. *Id.* § 1.414(c)-2(c)(2)(i) (Treas. Reg. § 1.414(c)-2(c)(2)(i)).

Here, Robert F. Riddle held a 100% ownership interest in Clarklift, TMR Realty Co., and Toyota Lift at all times relevant to this action. Pls.' Stmt. ¶ 3; Defs.' Resp. ¶ 3; Pls.' Mot. for Summ. J., Ex. 4 (Toyota Lift's 2002 and 2003 Tax Returns); *id.*, Ex. 3 (Defs.' Combined Answers to Pls.' First Set of Interrogs., Interrog. Nos. 1 & 2). Indeed, the information provided in the IRS Forms 1120S ("S Corporation Tax Return") filed by Defendant TMR Realty Co. show that it owned 100% of both Clarklift and Toyota Lift. *See* Pls.' Mot. for Summ. J., Ex. 2 (TMR's 2002 and 2003 Tax Returns). As such, Riddle has a "controlling interest" in Defendants TMR Realty Co. and Toyota Lift because he owns more than 80% of each corporation's stock, and he maintains "effective control" of these corporations because he owns more than 50% of each corporation's stock. Because Riddle maintains both a "controlling interest" in and "effective control" of Clarklift, TMR Realty Co., and Toyota Lift, these three companies comprise a "brother-sister" control group under the Treasury Regulations and ERISA Section 4001(b)(1).

Alternatively, with respect to a "parent-subsidiary" control group, the regulations provide that a "parent-subsidiary" group includes any entity in a chain if each entity in the chain is owned, directly or indirectly, by a common parent with a *controlling interest* (i.e., 80% or greater of the

ownership).  *See* 26 C.F.R. § 1.414(c)-2(b) (Treas. Reg. § 1.414(c)-2(b)).  Where, as here,

Defendant TMR Realty Co. is listed as owning 100% of Clarklift and Defendant Toyota Lift, *see*

Pls.' Mot. for Summ. J., Ex. 2 (TMR's 2002 and 2003 Tax Returns), then a "parent-subsidiary"

control group exists under the Treasury Regulations and ERISA Section 4001(b).

As such, regardless of whether 100% of the stock of each of the corporations is owned by

TMR Realty Co. (and therefore Riddle, indirectly) or by Riddle himself directly, it is clear that

Clarklift and Defendants TMR Realty Co. and Toyota Lift are members of the same control group

for the purposes of ERISA.  Accordingly, Defendants TMR Realty Co. and Toyota Lift are jointly

and severally liable for Clarklift's withdrawal liability under ERISA.  *See Pension Benefit Guar.*

*Corp. v. Ouimet Corp.*, 470 F. Supp. 945, 947-48 (D. Mass. 1979), *aff'd*, 630 F.2d 4 (1st Cir.

1980), *cert. denied*, 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981); *see also Connors v.*

*Incoal, Inc.*, 995 F.2d 245, 249 (D.C. Cir. 1993) (trades or businesses under common control with

the withdrawing employer are jointly and severally liable for the principal employer's withdrawal

liability); *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 121 (4th Cir. 1991)

("Control group members are plainly liable for withdrawal liability of other members.").  Indeed,

under the multiemployer plan context envisioned by the MPPAA, such joint and several liability still

applies.  For instance, in enacting the MPPAA, Congress stressed that:

> [I]f a terminating single employer plan is maintained by one or more members of a
> controlled group, the entire group is the "employer" and is responsible for any
> employer liability.  The leading case in this area is *Pension Benefit Guaranty Corp.*
> *v. Ouimet Corp.*, 470 F. Supp. 945 (D. Mass. 1979),  in which the court correctly
> held that all members of a controlled group are jointly and severally liable for
> employer liability imposed under section 4062 of ERISA.  The bill does not modify
> the definition of "employer" in any way and the *Ouimet* decision remains good law.

126 Cong. Rec. S11672 (daily ed., Aug. 26, 1980) (statement of Senator Williams); *see also*

*Mason & Dixon Tank Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 852 F.2d 156,

159 (6th Cir. 1988) (holding that the MPPAA retained ERISA's common control provisions).

Given their interrelationships, the relevant regulations, and binding case law, it is clear that

Defendants TMR Realty Co. and Toyota Lift are control group members with Clarklift.  As such,

assuming that they were provided adequate notice of Clarklift's withdrawal liability, Defendants

will be jointly and severally liable for the amount assessed against Clarklift.

        3.      The Plan's Withdrawal Liability Notice to Clarklift Was Also Valid Notice
as to Both Defendants

As noted above, deadlines for the payment of withdrawal liability, plan sponsor review, and

arbitration are triggered by notice and demand for payment to the employer – i.e., Clarklift.  *See,*

*e.g.*, 29 U.S.C. § 1399(b)(2)(A) & (c)(2) (ERISA Sections 4219(b)(2)(A) & (c)(2)).  In this case,

notice and demand for payment was only provided to Clarklift; it was not sent directly to either

Defendant TMR Realty Co. or Toyota Lift.  However, this distinction is a non-issue legally:  once

notice is issued to any one member of a control group, that notice is deemed to have been provided

to all members of the group.  In the preamble to the regulation, entitled "Notice and Collection of

Withdrawal Liability," under ERISA 4219, the PBGC stated:

> [U]nder ERISA there is a unity of interest in the case of a controlled group of
> corporations, since the entire group is considered to be a single employer for
> withdrawal liability and other purposes.  Therefore, PBGC believes that a notice of
> default sent to the contributing entity which is a member of a controlled group of
> corporations, within the meaning of Section 4001(b)(1) [29 U.S.C. § 1301(b)(1)],
> constitutes constructive notice to the other members of the same controlled group.
> Thus, PBGC finds that Section 4219(c)(5)(A) [29 U.S.C. § 1399(c)(5)(A)] does not
> require notice to the other members of a controlled group.

49 Fed. Reg. 22,642, 22,644 (May 31, 1984) (codified at 29 C.F.R. § 2644).

Courts within this jurisdiction have consistently applied this rule to find that notice to one

employer in a controlled group constitutes notice to all other members of that group.  *See Connors*

*v. Calvert Dev. Co.*, 622 F. Supp. 877, 881 (D.D.C. 1985); *see also I.A.M. Nat'l Pension Fund,*

*Plan A, A Benefits v. Slyman Indus., Inc.*, 901 F.2d 127, 129 (D.C. Cir. 1990) (holding that notice

to a bankrupt member of a controlled group also constituted constructive notice to the other

members of the group).  As the *Calvert Development* court stressed,

> It is clear that notice and demand to one is notice and demand to all.  Defendants'
> position that Section 1301(b)(1) should be read to mean that all entities of the
> common control group be afforded the same procedural rights as the withdrawn
> employer must fail.  Indeed, such an interpretation would void that section of any
> significance.  The notice and demand of withdrawal liability served upon Calvert by
> the Trustees also was sufficient as to C.A.M., C.C. & L., and the individual
> defendants.

*Calvert Dev. Co.*, 622 F. Supp. at 881-82.  This rule is consonant with a host of decisions from

other jurisdictions.  *See, e.g.*, *Teamsters Pension Trust Fund-Bd. of Trustees v. Allyn Transp. Co.*,

832 F.2d 502, 506 (9th Cir. 1987) (rejecting a separate notice requirement); *IUE AFL-CIO Pension*

*Fund v. Barker & Williamson*, 788 F.2d 118, 127 (3d Cir. 1986) ("Deeming that actual notice to

the employer corporation serves as constructive notice to all other members of a controlled group is

consistent with the language and purpose of both ERISA and the MPPAA."); *Trustees of the*

*Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Central Transp.,*

*Inc.*, 888 F.2d 1161, 1163-64 (7th Cir. 1989) ("notice and demand to one member of a control

group is notice and demand to all in the control group"); *Cent. States, Se. & Sw. Areas Pension*

*Fund v. Skyland Leasing Co.*, 691 F. Supp. 6, 13 (W.D.Mich. 1987) (same).

Accordingly, the Plan's notice to Clarklift constituted notice to all members of the control

group – including Defendants TMR Realty Co. and Toyota Lift.  The Plan's January 3, 2003

assessment letter, addressed and sent to Robert F. Riddle, the 100% owner of Clarklift, also

constituted the legal "notice and demand" that triggered liability for the two other companies of

which Riddle was also the 100% owner, i.e., Defendants.  This assessment of control group

members was as the Plan had forewarned Riddle in its October 11, 2002 letter, which put Riddle on

notice of potential withdrawal liability for Clarklift *and Clarklift's control members*.  *See* Pls.'

Mot. for Summ. J., Ex. C to the Skolnick Decl. (10/11/02 Skolnick Letter to Riddle re: Possible

Withdrawal Liability).  Although the October 11, 2002 notice warned Riddle that the Plan intended

to treat "all employees under common control within the meaning of the Act" as a "single

employer," *id.*, Riddle ignored that notice – both for Clarklift and for the other members of the

control group.  *See also* Pls.' Mot. for Summ. J., Ex. B to the Skolnick Decl. ("Employer

Agreement") ¶¶ 5-7 (by signing the Employer Agreement, Riddle represented that (1) Clarklift "had

the full power and authority to enter into this Agreement on behalf of itself and all trades or

businesses under common control with it"; and (2) the Employer Agreement was binding and

enforceable not only as to Clarklift but as to all other members of the control group).

As such, a preliminary review of the Plan's affirmative case against Defendants TMR Realty

Co. and Toyota Lift indicates that they are each jointly and severally liable for the withdrawal

liability at issue in this case.  Importantly, (1) withdrawal liability was assessed by the Plan against

Clarklift pursuant to the requisite ERISA provisions; (2) Defendants TMR Realty Co. and Toyota

Lift are parts of the same control group as Clarklift, and are therefore jointly and severally liable for

Clarklift's withdrawal under ERISA and the MPPAA; and (3) under applicable law, notice to

Clarklift was sufficient to provide constructive notice to the other companies owned by Riddle

within the control group, including Defendants TMR Realty Co. and Toyota Lift.  However, the

Court must address Defendants' defenses before finalizing this preliminary conclusion.

B.      *Defenses Asserted by Defendants TMR Realty Co. and Toyota Lift*

Defendants TMR Realty Co. and Toyota Lift have asserted two major defenses in an effort

21

to avoid joint and several liability for Clarklift's withdrawal liability.  First, Defendants claim that

they did not waive their ability, under either ERISA generally or the Employer Agreement

particularly, to contest the Plan's withdrawal determination against Clarklift.  *See* Defs.' Opp'n at

3-6.  Second, Defendants contend that (1) the Clarklift and IMH plans of reorganization, which

closed out their Chapter 11 bankruptcy proceedings, discharged TMR Realty's withdrawal liability

to the Plan, *see* Defs.' Mot. for Summ. J. at 4-9; and (2) the notices provided by the Plan were

ineffective given the automatic stay provision of the Clarklift and IMH bankruptcies, *see* Defs.'

Opp'n at 6-8.  The Court shall review each defense in turn.

       1.    <u>Defendants' (In)Ability to Contest the Plan's Withdrawal Determination</u>

Defendants TMR Realty Co. and Toyota Lift make two distinct arguments in an attempt to

undermine the Plan's withdrawal determination.  First, Defendants contend that no withdrawal

occurred because (1) they relied upon District 15's apparent approval of the transfer of Clarklift's

employees to IMH's facility, and (2) the underling transaction was a permitted sale of assets under

the Employer Agreement that allowed Defendants to avoid withdrawal liability.  *See* Defs.' Opp'n

at 3-4, 7 (citing Pls.' Mot. for Summ. J., Ex. B to the Skolnick Decl. ("Employer Agreement") ¶

5(a)(iv)).  Second, Defendants claim that "[a]t a minimum, the consents given by District 15,

coupled with Plaintiffs' failure to file or assert any claims during Clarklift's bankruptcy, as well as

Robert Riddle's reasonable belief that no withdrawal actually occurred, all combine to provide

ample grounds for application of equitable tolling should the Court find *arguendo* that there was a

requirement to seek formal arbitration by any of the Defendants."  *Id.* at 4-5.  Both arguments are

without merit.

       a.    *Attempt to Challenge Withdrawal Determination*

With respect to Defendants' contention that no withdrawal actually occurred, it is not clear

that Defendants' allegation is factually accurate.  Importantly, the Plan is an entity that is separate and distinct from District 15, with separate and distinct legal rights and obligations.  *See* Pls.' Opp'n, Ex. 2 (Second Skolnick Decl.) ¶ 3*; see also* Pls.' Reply, Ex. C to the Decl. of Joseph P. Martocci, Jr. (6/21/05 Dep. of James Conigliaro, Director for District 15) at 34 ("[t]here is no relationship" between District 15 and the Plan), at 42 ("We don't have any authority from the National Pension Plan"), at 73 ("We don't have the authority to approve any liability related to the I.A.M. National Pension Fund, is my understanding."), at 92 ("I'm not an agent for the National Pension Fund.").  Given their relationship, it is not at all clear whether any promises made by District 15 to Clarklift and Riddle would be legally binding on the Plan, or prevent it from bringing this action.  Moreover, it is also unclear as to whether the Employer Agreement would have allowed Clarklift to avoid withdrawal liability under a theory that its dealings with IMH constituted a valid "sale of assets."  The Plan suggests that the transaction that actually occurred "was not an 'arms length' sale between unrelated parties as required by the Employer Agreement and ERISA, nor did it involve the posting of a bond, or any other security, in favor of the Fund as required by the Employer Agreement and ERISA."  *See* Pls.' Reply at 5 n.5 (citing Employer Agreement § 5(a)(iv); ERISA Section 4204(a)(1)(A); 29 U.S.C. § 1384(a)(1)(A)).

Whether or not an actual withdrawal occurred when Clarklift transferred and ceased its operations is not for this Court to determine, as such a matter is not particularly relevant to the resolution of this case or the present posture of this dispute.  What is significant is the fact the Plan provided a valid notice of assessment of withdrawal liability, to which Clarklift (and/or Defendants TMR Realty Co. and Toyota Lift) were required to seek arbitration under ERISA Sections 4221 and 4219, *see* 29 U.S.C. §§ 1399 & 1401, in order to preserve their defenses to the Plan's determination that a withdrawal had occurred.  It is uncontested that both Clarklift and Defendants

failed to take this mandatory step, neglecting to initiate arbitration within the time period prescribed

by the statute.  It is well-established that if an employer misses the Section 4219 arbitration deadline,

it forfeits its defenses to the withdrawal liability assessment.  *See, e.g.*, *I.A.M. Nat'l Pension Fund v.*

*Clinton Engines Corp.*, 825 F.2d 415, 419-421, 429 (D.C. Cir. 1987) (holding that the employer

was barred from challenging the plan's withdrawal assessment decision where it did not seek

arbitration but instead waited until the fund brought a collection action, finding that the

determination of whether there had been a withdrawal was an issue that fell "within the ambit of 29

U.S.C. § 1401(a)" and should have been submitted to arbitration); *Grand Union Co. v. Food*

*Employers Labor Relations Ass'n*, 808 F.2d 66, 67-70 (D.C. Cir. 1987) (employer was barred

from commencing action in district court because it failed to first pursue and exhaust administrative

remedy); *Slyman*, 901 F.2d at 129-30 (affirming that company's failure to invoke the review and

arbitration procedures of the MPPAA within the time limit provided in that statute barred it from

contesting the plan's determination of the amount owed); *see also ILGWU Nat'l Ret. Fund v. Levy*

*Bros. Frocks, Inc.*, 846 F.2d 879, 886 (2d Cir. 1998) ("the arbitration provisions of MPPAA . . .

constitute an exhaustion of administrative remedies requirement"); *Allyn Transp. Co.*, 832 F.2d at

503-04 (following *Clinton Engines Corp.* to hold that "questions of statutory interpretation are not

excepted from arbitration under MPPAA").

     While courts have allowed parties to escape arbitration in certain cases and proceed directly

to judicial resolution of withdrawal liability, such circumvention is only proper if the party "should

seek declaratory and/or injunctive relief against the imposition of withdrawal liability *before the*

*time period to initiate arbitration expires*."  *Levy Bros. Frocks*, 846 F.2d at 887 (citing *Clinton*

*Engines Corp.*, 825 F.2d at 427-28; *Barker & Williamson*, 788 F.2d at 129) (emphasis added).

Here, Defendants TMR Realty Co. and Toyota Lift waited until well after the relevant time period

for arbitration expired to contest the withdrawal liability assessed against their fellow control group

member Clarklift.  As such, they now face a situation similar to the one confronted in *Levy Bros.*

*Frocks* and *Barker & Williamson*; "[t]he failure to seek such relief on a timely basis may, in some

instances, lead to a harsh result, but the harshness of the default is largely 'a self-inflicted wound.'"

*Id.* (citing *Barker & Williamson*, 788 F.2d at 129).

> b.     *Equitable Tolling Argument*

Perhaps recognizing this significant problem, Defendants also contend that – given the facts

in this case – the Court should act to equitably toll the arbitration period, and allow them to contest

the Plan's withdrawal assessment at this point in a proceeding before an arbitrator.  *See* Defs.'

Opp'n at 3-6, 9.  However, upon a review of the record and relevant case law, it is clear that

equitable tolling should not apply in this instance.  Here, despite the Plan's repeated notices

regarding the assessment and computation of withdrawal liability against Clarklift, Defendants

chose to ignore their obligations under the statute as members of the same control group.  They both

failed to initiate arbitration and to make payments to the Fund in accordance with the Notice of

Demand and Schedule of Payments as required under the MPPAA.  *See* 29 U.S.C. §§ 1401 & 1399

(ERISA Sections 4221 & 4219).  This choice was ill-advised and provides no basis upon which to

toll ERISA's time deadlines for seeking mandatory arbitration or to allow Defendants – years after

receiving constructive notice of the withdrawal liability assessment – to proceed to arbitration.

Indeed, the D.C. Circuit's decision in *Slyman* is instructive on this point.  In *Slyman*, the

petitioners were members of a control group who failed to contest via arbitration the withdrawal

liability assessment made against a bankrupt member of the group.  *See Slyman*, 901 F.2d at 129.

Contending that they believed that their inaction was justified by the bankruptcy court's automatic

stay and that any action would have to proceed through the bankruptcy court, they took no steps to

defend themselves against liability.  *Id.*  When faced with a collection action in the district court,

petitioners sought to avoid liability through an equitable tolling argument.  *Id.* at 129-30.  The D.C.

Circuit rejected this argument outright, noting that the bankrupt entity or other control group

members should "either have protested the Fund's Notice of Demand or objected to its Proof of

Claim before the bankruptcy court."  *Id.* at 129.  Having failed to do so, the *Slyman* court found that

the bankrupt company was "barred from doing so now," and consequently, its control group

members were also time-barred.  *Id.* at 130.  The D.C. Circuit emphasized that the other control

group member's "claimed right now to seek arbitration of the withdrawal liability is purely

derivative from [their fellow member's] status as a bankrupt at the time it received the Fund's

demand for payment, which has availed it not."  *Id.*  As such, Defendants request that equitable

tolling be applied where the relevant facts are almost identical to those in *Slyman* is contrary to

controlling authority in the Circuit.

　　　Further support for this principle can be located in other jurisdictions.  For instance, the

Fourth Circuit confronted situation similar to this case (and the *Slyman* case) in *McDonald v.

Centra, Inc.*, 946 F.2d 1059 (4th Cir. 1991).  There, the solvent members of the control group

asserted that the arbitration period was tolled by the initiation of bankruptcy proceedings by the

withdrawing member.  *See id.* at 1064.  Upon a consideration, the Fourth Circuit rejected this

argument outright as being antithetical to the MPPAA context, given that the MPPAA was created

"(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer

plans, and (2) . . . to ensure benefit security to plan participants."  *Id.* (citations omitted).  As such,

the *McDonald* court held:

> Under the MPPAA, however, allowing a defendant to toll the period for arbitration during bankruptcy proceedings and a collection suit undercuts the purpose of the statute, the timely adjudication of withdrawal liability disputes to insure the security of multiemployer plans. Thus, we hold that equitable tolling is inapplicable in the MPPAA context.

*Id.* at 1065.

A review of the numerous cases cited by Defendants reveals either that (1) the cases in which equitable tolling was allowed are clearly factually dissimilar to this case, or (2) the cases actually support a rejection of Defendants' equitable tolling claim. *See* Defs.' Opp'n at 5. For instance, these cases cited by Defendants are factually inapplicable to the circumstances of this dispute. *See, e.g.*, *Doherty v. Teamsters Pension Trust Fund*, 16 F.3d 1386, 1393-94 (3d Cir. 1994) (tolling of statute was permissible in limited circumstance where employer's terminally ill attorney timely filed objection to plan's withdrawal liability assessment in wrong forum); *Central Transp., Inc.*, 888 F.2d at 1164-65 (statutory period tolled where employer timely filed objection to plan's withdrawal liability assessment in an alternate forum); *Banner Indus., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1293 (7th Cir. 1989) (holding that district court did not abuse its discretion in tolling the statutory period "because [the employer] moved decisively to present the issue in court *within the statutory period for arbitration*") (emphasis added). In contrast, these cases relied upon by Defendants actually undermine their argument, and highlight why equitable tolling is inapplicable in this case. *See, e.g.*, *Banner Indus.*, 875 F.2d at 1293 (noting that there would have been no justification for tolling the statute had the employer "waited until the pension filed a collection against it, and then for the first time tried to asset its defense in court when it should have proceeded in arbitration"); *Bowers v. Transp. Martima Mexicana, S.A.*, 901 F.2d 258, 263-65 (2d Cir. 1990) (holding that an employer that failed to pay the amounts set forth in the plan's

schedule and demand for payment and failed to seek review and arbitration within the statutory

period had waived its defenses to the plan's withdrawal liability determination); *Cent. States, Se. &*

*Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1376-77 (7th Cir. 1992) (finding that employer

was not entitled to equitable tolling where he failed to display due diligence by waiting until he was

sued in plan's collection action to raise objections "having till then emitted nary a peep to suggest

that he was contesting the assessment of withdrawal liability").

Accordingly, based on the circumstances of this case and the relevant case law, the Court

concludes that (1) Defendants' attempt to litigate the propriety of the Plan's withdrawal liability

determination against Clarklift (and, by application, them) in this Court must fail as it is untimely

and barred by applicable statute; and (2) the doctrine of equitable tolling is inapplicable under the

present facts as a saving mechanism for Defendants' objections.  Because Defendants' first line of

defense lacks any foundation, the Court shall turn to Defendants' second line of defense in order to

determine whether Defendants TMR Realty Co. and Toyota Lift can avoid liability under any other

theory.

### 2. The Effect of Clarklift's Bankruptcy Vis-á-Vis Defendants

Defendants' second defense centers around Clarklift's bankruptcy, and can be divided along

two prongs.  First, Defendants  contend that (1) the notices provided by the Plan were ineffective

given the automatic stay provision of the Clarklift and IMH bankruptcies, *see* Defs.' Opp'n at 6-8;

and (2) the Clarklift and IMH plans of reorganization, which closed out their Chapter 11 bankruptcy

proceedings, discharged TMR Realty's withdrawal liability to the Plan, *see* Defs.' Mot. for Summ.

J. at 4-9.  Upon an examination, it is clear that the seeds of both assertions bear no fruit:

Defendants' implication that Clarklift's concurrent bankruptcy somehow affected their rights and

responsibilities as control group members is without foundation.

a.    *Defendants' Notice Argument*

Defendants TMR Realty Co. and Toyota Lift claim that while the general rule that notice to one member of a control group (i.e., Clarklift) is notice to all other potential entities in a control group holds true outside the bankruptcy context, it is inapplicable when the withdrawing party initiates bankruptcy proceedings prior to the Plan's Notice of Demand and Schedule of Payments. According to Defendants, given that the Plan's Notice was sent to Clarklift after it initiated Chapter 11 bankruptcy proceedings in the Eastern District of New York on July 5, 2001, the notice was in violation of the automatic bankruptcy stay and should not be given preclusive effect.  Because the Plan never received leave of the Bankruptcy Court to serve the notices to Clarklift and never filed any claims against Clarklift during its bankruptcy, Defendants contend that the notices were invalid; absent proper service, the Plan's withdrawal liability assessment was improper.  *See* Defs.' Opp'n at 6-8 (citing *Kalb v. Feuerstein*, 308 U.S. 433, 438, 60 S.Ct. 343, 84 L.Ed. 370 (1940); *Ellis v. Consol. Diesel Elec. Corp.*, 894 F.2d 371, 372 (10th Cir. 1990); *In re Sambo's Restaurants*, 754 F.2d 811, 816 (9th Cir. 1985)).

Before beginning an analysis of the impact of the automatic bankruptcy stay provision, *see* 11 U.S.C. § 362, on the Plan's Notice of Demand provided to Clarklift, two points are worth noting. First, there is no suggestion here that Robert Riddle – the sole shareholder of Clarklift, TMR Realty Co., and Toyota Lift – was unaware that TMR Realty Co. and Toyota Lift was potentially a member of a group of trades or businesses under common control.  Indeed, Riddle was given actual notice of the Plan's assessment of withdrawal liability against Clarklift and the potential implications for other control group members, yet failed to take any action to protect the interests of either TMR Realty Co. or Toyota Lift, despite the fact that he was the owner, controlling party, and sole shareholder of all relevant entities.  Second, despite their claim now that the Plan's notices to

Clarklift violated the automatic bankruptcy stay in effect following its initiation of Chapter 11

proceedings, it is also uncontested that Defendants TMR Realty Co. and Toyota Lift (as well as

Clarklift) took no steps during the bankruptcy proceeding to protect themselves from the Plan's

notices – of which they were fully aware while the bankruptcy proceedings were pending.  A review

of the current record before the Court reveals no evidence to indicate that Defendants ever notified

the bankruptcy court of the violation that they now assert protects them from liability.  *See* Pls.'

Opp'n, Ex. 2 (Second Skolnick Decl.) ¶ 4.

     With these considerations in mind, the Court turns to relevant case law, both in this Circuit

and in other jurisdictions.  Within the D.C. Circuit, *Slyman* is perhaps the only significant decision

that has touched on this issue.  *See Slyman*, 901 F.2d at 129-30.  In *Slyman*, the solvent control

group members asserted that "the Fund's [Notice of Demand] violated the automatic stay provision

of the Bankruptcy Code" and "suggest[ed] the Notice may for that reason have been ineffective as

legal notice under the MPPAA."  *Id.* at 129.  The D.C. Circuit rejected this argument, noting – as is

the case here – that neither the control group members or the withdrawing party argued before the

bankruptcy court that the Notice of Demand violated the automatic stay.  *Id.* at 130.  Given that the

relevant entities failed to "protest[] the Fund's Notice of Demand or object[] to its Proof of Claim

before the bankruptcy court," the *Slyman* court found that the parties were now time-barred from

asserting this defense.  *Id.*

     The Seventh Circuit touched on this issue in two decisions authored by Judge Richard A.

Posner – *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369 (7th Cir. 1992), and

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911 (7th Cir.

2001).  In *Basic American Industries*, Judge Posner – in dicta – noted that "although 'demanding'

payment from a debtor in bankruptcy itself is normally a violation of the automatic stay, the demand

for payment of withdrawal liability is probably an exception to this principle." *Basic Am. Indus.*,

252 F.3d at 918 (citing *Slotky*, 956 F.2d at 1375-76). In *Slotky*, the earlier decision, Judge Posner

followed this line of reasoning to hold that the imposition of the automatic stay did not bar the

relevant fund from making a Notice of Demand upon the withdrawing party:

> As for the automatic stay, there is admittedly an analogy between an outright suit
> against the bankrupt, which would incontrovertibly violate the stay, § 362(a)(1), and
> a notice and demand that kicks off a sequence of conciliation and arbitration which
> may well result in an arbitrator's order – equivalent to, because enforceable by, a
> legal judgment – against the bankrupt. The analogy may fail, for while the
> automatic stay probably applies to arbitrations equally with adjudications, an initial
> demand does not inaugurate a litigation or even create a lien (another act barred by
> the automatic stay). But even if the demand violated the automatic stay, all that this
> would mean, it seems to us, so far as bears on this case (for the violation might of
> course expose the violator to contempt proceedings, as with any other violation of a
> judicial order), is that the pension plan could not proceed against [the bankrupt,
> withdrawing party] unless the bankruptcy judge lifted the stay. *The demand would
> still be effective against nonbankrupt members of the controlled group*[.]

*Slotky*, 956 F.2d at 1376 (internal citations omitted) (emphasis added); *see also Centra,* 946 F.2d

at 1065 (finding that the automatic stay has no legal effect upon the solvent parties).

These cases point to the conclusion that the automatic stay obtained by Clarklift on July 5,

2001 had no impact on the notices provided to Clarklift – and by extension, Defendants TMR

Realty Co. and Toyota Lift – beginning with the Plan's Notice and Demand on October 11, 2002.

*See* Pls.' Mot. for Summ. J., Ex. C to the Skolnick Decl. (10/11/02 Skolnick Letter to Riddle re:

Possible Withdrawal Liability). Indeed, while the *Slotky* court noted that there might be a problem

with an outright suit against the bankrupt, two points are worth noting: (1) Clarklift and IMH

emerged from their respective bankruptcy proceedings on July 10, 2003, pursuant to an Order dated

July 24, 2003, *see* Defs.' Stmt. ¶ 22; Pls.' Resp. ¶ 22, while the Plan waited to initiate this suit until

April 12, 2004, after the bankruptcy proceedings had ended, *see* Compl. at 1; and (2) like the *Slotky*

and *Slyman* cases, the Plan initiated suit only against the solvent members of the withdrawing,

bankrupt party's control group – not the bankrupt entity.  Moreover, as emphasized by *Slotky* and

touched on elsewhere, even assuming *arguendo* that the Plan's notice was somehow contrary to the

automatic stay, (1) neither Defendants nor Clarklift contested the notice in the bankruptcy court, and

(2) the notice – even if invalid as to Clarklift – remained effective as to the "nonbankrupt members

of the controlled group."

      The cases relied upon by Defendants in their attempt to escape this inevitable conclusion are

plainly inapposite.  Unlike *Kalb*, in which the Supreme Court concluded that a state court's order

permitting a sale of foreclosed property after the owners filed for bankruptcy protection violated the

automatic stay, *see* 308 U.S. at 440-43, 60 S.Ct. 343, or *Ellis*, in which a district court improperly

issued an order in violation of the automatic stay, *see* 894 F.2d at 372-73, the Plan in this case has

not initiated any judicial proceedings to collect withdrawal liability from either Clarklift or IMH, the

bankruptcy debtors.  The other decision cited by Defendants, *In re Sambo's Restaurants*, actually

supports the Plan's position.  There, the Ninth Circuit concluded that the Bankruptcy Code's

automatic stay provision did not prevent a bankruptcy court from considering a civil complaint as an

amendable informal proof claim.  *See In re Sambo's Restaurants*, 754 F.2d at 816.  In reaching its

decision, the court stated:

> The general rule is that actions taken in violation of the automatic stay are void.  *But
> this rule usually is applied to transfers of property and the like*.  No case has been
> cited to us nor are we aware of any case that has discussed whether the automatic
> stay precludes such a complaint from being an amendable informal proof of claim.
> Logically it should not, and we hold it does not, because such a rule would lead to
> absurd results.

*Id.* (internal citations omitted) (emphasis added).  In short, *In re Sambo's Restaurants* makes clear

that not all actions taken during a bankruptcy proceeding are violative of the Bankruptcy Code's

automatic stay provision.

Here, the record is clear and undisputed that, beyond issuing the statutorily required withdrawal liability notice, the Plan made no effort to pursue its withdrawal liability claim against Clarklift and IMH.  Rather, as expressly permitted by ERISA and the Bankruptcy Code, the Plan filed suit and pursued claims against Clarklift's non-bankrupt, control group members for their own joint and several liability.  *See* 29 U.S.C. § 1301(b)(1) (ERISA Section 4001(b)(1); 11 U.S.C. § 362.  As such, this Court joins the *Slyman*, *Slotky*, *Basic American Industries*, and *McDonald* courts in finding that the imposition of the automatic stay in Clarklift's Chapter 11 proceedings had no impact upon the Plan's Notice of Demand, the constructive notice of TMR Realty Co. and Toyota Lift, and the ultimate imposition of withdrawal liability.  Accordingly, the Court concludes that the Plan's withdrawal liability notice was valid notice as to Defendants TMR Realty Co. and Toyota Lift, and that Defendants' bankruptcy/notice defense is without merit.

### b.   *Discharge and Res Judicata*

Defendants TMR Realty Co. and Toyota Lift next attempt to escape joint and several liability for the withdrawal liability assessed against control group member Clarklift by contending that:  (1) the Plan's claims for withdrawal liability were discharged during Clarklift's bankruptcy, even if they were not filed with the bankruptcy court; (2) Defendants have been released from liability by the plans of reorganization; and (3) the principles of *res judicata* support the entry of judgment for Defendants.  *See* Defs.' Mot. for Summ. J. at 5-8.  Upon an examination, it is plain that each argument put forth by Defendants is without merit.

### i.   The Plan's Withdrawal Liability Claim Against Defendants Was Not Discharged in Clarklift's Bankruptcy

Here, Defendants claim that "[b]ecause Plaintiffs' alleged claims for withdrawal liability

33

arose pre-petition, they were discharged in bankruptcy by virtue of Plaintiffs' failure to assert any claim." *Id.* at 5; *id.* at 6 (citing *CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73*, 162 F.3d 405, 407 (6th Cir. 1998) ("If the Plan had a 'claim' for withdrawal liability at confirmation, that claim was discharged (unless the confirmation order provided otherwise), and CPT would only be subject to withdrawal liability based on its postconfirmation contribution history.")).  Defendants' assertion is contrary to applicable law.

Importantly, Clarklift's discharge of withdrawal liability upon confirmation of its plan of reorganization does not affect the withdrawal liability obligations of Defendants TMR Realty Co. and Toyota Lift, the other non-bankrupt members of the control group.  *See* 11 U.S.C. § 524(e) (providing, in relevant part, that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt").  Numerous courts have rejected similar attempts by solvent entities to escape their joint and several withdrawal liability obligations. *See, e.g.*, *Slyman*, 901 F.2d at 129 (emphasizing that a bankrupt employer's "protection from suit pursuant to the Bankruptcy Code simply cannot affect the derivative legal liability of a nonbankrupt affiliate"); *Teamsters Joint Council No. 83*, 947 F.2d at 121-22 (holding that the bankruptcy of one control group member cannot be used to offset or reduce the joint and several obligations of other members of the control group).  In *McDonald*, *see* 946 F.2d at 1065, previously discussed *supra* Section III(B)(1)(b), the solvent control group members argued, *inter alia*, that resolution of the liability of a withdrawing employer in the context of a bankruptcy proceeding resolves the liability of all non-bankrupt control group members.  The Fourth Circuit rejected this argument, concluding instead that a bankrupt debtor's insolvency has no bearing on the liability of affiliated defendants or their ability to pay a withdrawal assessment.  The *McDonald* court explained:

34

> [T]he withdrawing employer [cannot] affect the derivative legal liability of a nonbankruptcy affiliate, for the same reason that one tort-feasor would not be protected because another was in bankruptcy proceedings . . . . [W]hile a control group may be treated as a 'single employer' under the MPPAA, it is a defendant with many pockets.  Were all members of the group discharged, this court would allow the defendant to mark its front pockets bankrupt, while removing assets to its back pockets.  Accordingly, the corporate group is jointly and severally liable.

946 F.2d at 1065.

The case cited to by Defendants, *CPT Holdings*, compels no contrary conclusion.  There, the Sixth Circuit concluded that a post-bankruptcy confirmation control group member did not owe withdrawal liability for another bankrupt control group member's pre-confirmation activities because the debtor's withdrawal liability was discharged upon confirmation of its bankruptcy plan. *See CPT Holdings*, 162 F.3d at 406-07.  However, the Sixth Circuit's ruling was specifically predicated upon an understanding that the control group members in question were not commonly controlled prior to confirmation, and therefore no liability for pre-confirmation activities could have been passed to the non-bankrupt control group member that became a member of the group *after* the bankruptcy discharge. *Id.*  In contrast, in this case Defendants TMR Realty Co. and Toyota Lift were members of the control group, which included Clarklift, both *prior to* and *after* the bankruptcy court's confirmation of Clarklift's plan of reorganization on July 24, 2003.  Moreover, ERISA's statutory control group requirements automatically imposed liability on Defendants TMR Realty Co. and Toyota Lift at the time Clarklift withdrew from the Plan at the end of 2000. *See supra* Section III(A)(2).  As such, the bankruptcy court's discharge of Clarklift's withdrawal liability simply had no effect on Defendants' separate joint and several liability obligations to the Plan, and Defendants' argument to the contrary is simply unavailing, given the applicable law articulated in *Slyman*, *Teamsters Joint Council No. 83*, and *McDonald*.

ii.　Defendants Have Not Been Released From Liability Under Clarklift's Plan of Reorganization

Defendants next attempt to avoid joint and several liability by contending that Defendant TMR Realty Co., as a plan co-proponent in bankruptcy, was covered by certain release language under the confirmed plans of reorganization. *See* Defs.' Mot. for Summ. J. at 6. Defendants admit that this argument does not apply to Defendant Toyota Lift, which was not listed in the respective plans of reorganization. *Id.* ("As to Toyota Lift, the answer does not lie within the four corners of the plans *per se* . . . ."). Defendants point to two provisions in the Clarklift and IMH Plans of Reorganization ("Reorganization Plans") to support their claim – Article 6.1 and Article 9.2. Upon a review, it is evident that neither provision is applicable in this instance. While Defendants' argument might well ring true with respect to the Plan's assessment of withdrawal liability against Clarklift, as the withdrawing employer, and against IMH, as a bankrupt Clarklift control group member, Defendants' contention that the discharge of debtors Clarklift and IMH in their own bankruptcy proceedings as to the claims of the Plan somehow acted also to discharge Defendant TMR Realty Co. – as the co-proponent of the bankruptcy confirmation plan – of all claims that Plaintiffs may have *against TMR Realty Co.* is simply without support.

First, Article 6.1 of the Reorganization Plans does not relieve Defendant TMR Realty Co. of its own liability to the Plan. Article VI of the Plans (Article 6.1, in particular) is merely one provision that describes how a certain class of claims is to be treated for the purposes of payment. *See* Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization) ¶ 6.1. Specifically, Article 6.1 provides that holders of Class 4 Unsecured General Claims who receive all or a portion of their Allowed Claims under the Reorganization Plans shall release and discharge "all existing claims, causes of actions, demands or rights to payment

against the Debtor [Clarklift and IMH, respectively], the Reorganized Debtor, the Proponents [TMR Realty Co. and Robert F. Riddle] or the Debtor's Estate arising prior to the" confirmation date of the Plans. *Id.* As such, the applicability of Article 6.1 to the Plan's withdrawal liability claim against TMR Realty Co. depends – in part – on whether the Plan is, with respect to their withdrawal liability claim, the holder of a Class 4 Unsecured General Claim.

The Reorganization Plans define an "Unsecured General Claim" to mean "an Allowed Claim against the *Debtor* that is not entitled to priority pursuant to any provisions of the Bankruptcy Code." *See* Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization), Article I at 5 (emphasis added). "Claim," in turn, is defined as:

> any scheduled or filed right to payment from the *Debtor* whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy [that] is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

*Id.* at 3 (emphasis added). In this case, withdrawal liability was not scheduled; rather, only negotiated delinquent pension contributions were scheduled. *See* Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. ¶¶ 5, 22. Finally, the term "Allowed Claim" is defined as:

> (i) a claim, *proof of which was filed* with the Clerk of the Court on or before the Bar Date . . ., or (ii) a claim which has been or hereafter is *scheduled* as liquidated in amount and not otherwise disputed or deemed contingent by the *Debtor* in its Schedules, Lists and Statements of Financial Affairs and Executory Contracts . . ., and, in the case of either clauses (i) or (ii) above, a claim (actual or scheduled) as to which no objection to the allowance thereof has been interposed by the Plan Proponent within the period of time fixed by the terms of the Plan, or as to which an objection has resulted in the allowance or disallowance thereof, in whole or in part, by an Order of the Bankruptcy Court which becomes [a] final order as defined below.

Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization), Article 1 at 2 (emphasis added). Here, it is undisputed that no proof of claim was

filed covering the Plan's withdrawal liability assessment.  *See* Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. ¶ 5.

When read in conjunction, it is evident that the Reorganization Plans neither released nor discharged Plaintiffs' withdrawal liability claim *against TMR Realty Co*.  The definition of an "Allowed General Claim" is limited to Allowed Claims against the debtors – i.e., Clarklift and IMH – that are not entitled to priority under Section 507 of the Bankruptcy Code, 11 U.S.C. § 507.  In contrast, the Plan's claim against TMR Realty Co. is based on TMR's independent liability as a member of the Clarklift control group for Clarklift's withdrawal liability.  Accordingly, while Article XV of the Reorganization Plans sets forth the effect of the plans, it expressly releases and discharges only the debtors – Clarklift and IMH – from liability for their pre-confirmation debts.  To read the Reorganization Plans in any other manner would lead to the untenable conclusion that TMR Realty Co. and Robert Riddle (as Proponents of the Plan), without ever having filed a bankruptcy petition, received a release and discharge of all claims, causes of actions, demands, or rights to payment that *their own creditors may have had against them*, even though such claims, causes of actions, demands, or rights to payment were completely independent of – and unrelated to – the Clarklift and IMH bankruptcy proceedings.  Such a conclusion is contrary to both the express terms of the Reorganization Plans' discharge provision, *see* Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization) ¶ 15.1, and Section 524(e) of the Bankruptcy Code, which provides, in pertinent part, that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt," *see* 11 U.S.C. § 524(e).

Second, Article 9.2 of the Reorganization Plans also does not relieve Defendant TMR Realty Co. of the Plan's withdrawal liability claim against it.  Specifically, Article 9.2 provides that the

Debtors' assets and properties (including all potential claims and causes of action) will remain with the Reorganized Debtors or, if permitted by the Bankruptcy Court, transferred to TMR Realty Co., free and clear of all pre-confirmation liens, claims, and interests. *See* Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization), Article 9.2. As such, a plain reading of Article 9.2 confirms that it allows TMR Realty Co., as the successor-in-interest, to receive the Debtors' (i.e., Clarklift and IMH) assets and properties free and clear of all pre-confirmation liens, claims, and interests.

Problematically for Defendants, TMR Realty Co.'s liability to the Plan is not based on its status as a successor-in-interest to Clarklift. Rather, TMR Realty Co.'s liability to the Plan is based on its status as a separate control group member. *See* 29 U.S.C. § 1301(b)(1). Accordingly, because TMR Realty Co. is independently liable for Clarklift's liability under ERISA, Article 9.2 does not act to discharge the Plan's withdrawal liability claim against Defendant TMR Realty Co.

Applied to the instant case, it is obvious that the confirmed bankruptcy plans discharged Clarklift and IMH – as the *debtors* – from any debt that arose before the date of confirmation of their respective plans of reorganization. *See* 11 U.S.C. § 1141. The same holds true for TMR Realty Co. *as a successor-in-interest* to Clarklift and IMH with regard to any of Clarklift's or IMH's pre-confirmation debts.[3] However, because the Plan's withdrawal liability claim against TMR Realty Co. is not based on its status as a successor-in-interest, but rather its status as a

_____

[3] As such, the case heavily relied upon in this area by Defendants, *In re CD Realty Partners*, 205 B.R. 651, 656 (Bankr. D. Mass 1997), is inapposite. In contrast to this case, *CD Realty Partners* involved an attempt by a multiemployer pension fund to collect withdrawal liability from a bankrupt debtor's successor-in-interest. *Id.* at 655. The court rejected this collection effort, holding that the successor-in-interest stands in the shoes of the bankrupt debtor. *Id.* at 660. However, in this case the Plan is not attempting to collect on its claim against Clarklift by turning to TMR Realty Co. as Clarklift's successor-in-interest; rather, it is focusing on TMR Realty Co.'s individual joint and several liability for the withdrawal as a solvent member of the applicable control group.

separate, solvent control group member jointly and severally liable, Clarklift's and IMH's discharge

has no effect on TMR Realty Co.'s withdrawal liability responsibilities.  *See, e.g.*, *Slyman*, 901 F.2d

at 129; *Teamsters Joint Council No. 83*, 947 F.2d at 121-122; *McDonald*, 946 F.2d at 1065;

*Slotky*, 956 F.2d at 1376-77.  Accordingly, the Court concludes that Defendant TMR Realty Co.'s

argument that the applicable Reorganization Plans somehow absolved it of its responsibilities to the

Plan is without merit:  TMR Realty Co. remains separately liable for its own joint and several

obligations as a solvent member of a control group that includes Clarklift, and the Reorganization

Plans simply do not alter this fact.

### iii.    *Res Judicata*

As their final defense, Defendants assert that the principle of *res judicata* should apply to

prevent the Plan from seeking relief against Defendant TMR Realty Co.  *See* Defs.' Mot. for Summ.

J. at 8 (leaving out Defendant Toyota Lift from this argument).  According to Defendants, it does

not "matter that TMR was not a debtor in bankruptcy since the discharge under the confirmed plans

of reorganization must be given *res judicata* effect."  *Id.*  "Here, of course, the principles of *res

judicata* should apply . . . to TMR since Plaintiffs were listed as a scheduled creditor and had actual

knowledge of the bankruptcies, but let the opportunity pass for asserting any type of claim for

withdrawal liability or objection to Chapter 11 plans.  As such, Plaintiffs remain bound by the terms

of the reorganization plans, which insulate TMR from liability."  *Id.* (citing *Corbett v. MacDonald

Moving Servs., Inc.*, 124 F.3d 82, 91 (2d Cir. 1997)).  Multiple problems exist to undermine

Defendants' *res judicata* argument.

First, Defendants' argument is predicated upon an assumption that "the terms of the

reorganizations plans . . . insulate TMR from liability."  *Id.*  As discussed above, *supra* Section

III(B)(2)(b)(ii), while the Reorganization Plans may well have insulated TMR Realty Co. from any liability that it would have otherwise incurred as a successor-in-interest to Clarklift and IMH, the plans did not insulate TMR Realty Co. from its own, separate joint and several liability as a control group member.  As such, even assuming *arguendo* the accuracy of Defendants' *res judicata* argument, Defendants would remain liable to the Plan for the withdrawal liability.

Second, *res judicata* simply has no bearing on the instant case.  To determine whether *res judicata* applies, the Court must decide (1) whether the parties are identical or in privity with each other in both suits; (2) whether the present claim is the same as the claim that was raised or might have been raised in the first proceeding; (3) whether a judgment was issued in the first action by a court of competent jurisdiction; and (4) whether the earlier decision was a final judgment on the merits.  *See U.S. Indus., Inc. v. Blake Constr. Co.*, 765 F.2d 195, 205 n.21 (D.C. Cir. 1985).  A comparison of the circumstances of this case to those present in *Federal Deposit Insurance Corp. v. O'Donnell*, 136 B.R. 585, 588 (D.D.C. 1991), demonstrates why *res judicata* is inapplicable in this situation.

In *O'Donnell*, the FDIC sued a number of guarantors on a defaulted promissory note.  The principal of the debtor, who was one of the non-debtor guarantors, argued that the debtor-corporation's reorganization plan released him from all liability for the debts of the bankrupt debotr and therefore was entitled to *res judicata* effect.  The district court agreed with this assessment, noting that the same cause of action was present in both actions because the bankruptcy court order expressly discharged the debtor's guarantors.  *O'Donnell*, 136 B.R. at 588.  The plan at issue in *O'Donnell* provided:

> Confirmation of the Plan shall remise, release and discharge the *Principal of the Debtor*, his successors, heirs and assigns, from any and all manner of claims and demands whatsoever, which any Creditor now has or might or could have against the Principal personally, in connection with or related to the operation of the Debtor from 1985 to the Effective Date.

*Id.* at 586.

In contrast, here it is clear that the Clarklift and IMH Reorganization Plans did not address the Plan's withdrawal liability claims against Defendants TMR Realty Co. and Toyota Lift. Rather, the Reorganization Plans only addressed the Plan's claim for negotiated contributions against IMH. *See* Defs.' Mot. for Summ. J., Ex. N to the Riddle/Nash Decl. (Debtors' Amended Chapter 11 Plan of Reorganization), Article 5(B). This claim is separate and distinct from the withdrawal liability claim at issue in the instant case. Moreover, as noted previously, because Defendants are jointly and severally liable for Clarklift's withdrawal liability, the fact that Reorganization Plans discharged the Plan's withdrawal liability claims against only the *Debtors* means that the Plan's withdrawal liability claims are not barred by *res judicata*. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 49 (1982) (claims against joint obligors are generally regarded as separate and distinct for *res judicata* purposes).

The sole case relied upon by Defendants in support of their *res judicata* argument – *Corbett* – is simply inapposite in the present context. In *Corbett*, the Second Circuit addressed whether a confirmed reorganization plan discharged a non-debtor control group member's withdrawal liability and, if so, whether the bankruptcy court's confirmation of the plan had *res judicata* effect on the non-debtor control group members' claims. *See Corbett*, 124 F.3d at 87-88. In finding that the plan did have *res judicata* effect, the court focused on (1) the express terms of the reorganization plan, which expressly covered the ERISA fund's claim against both the debtor and the non-debtor

control group members, *id*. at 91; and (2) the plan's express discharge provisions, which provided

that confirmation:

> operates as a discharge, pursuant to Bankruptcy Code Section 1141(d)(1) . . ., of any
> and all debts or Claims *against the Debtor, present and former officers and
> directors of the Debtor and against any Person which/who is an Insider or
> Affiliate of the Debtor that arose at any time before Confirmation* . . . whether
> accrued before, on, or after the Filing Date.  On the Effective Date, as to every
> discharged debt and Claim, the Creditor that held such debt or Claim shall be
> precluded from asserting against . . . [the reorganized debtor] or against . . . [the
> reorganized debtor's] assets or properties, any other or further Claim based upon any
> . . . activity . . . that occurred prior to the Confirmation Date.

*Id*. at 86-87 (emphasis added).  The Second Circuit interpreted this provision to effect a discharge of

all pre-confirmation "claims" against the non-debtor control group member.  *Id*. at 87.  Because the

ERISA fund in *Corbett* failed to appeal the bankruptcy court's order discharging the non-debtor

control group member, the court also concluded that the doctrine of *res judicata* precluded the fund

from collaterally attacking the bankruptcy court's jurisdiction to effect the discharge.

       This case presents a vastly different set of facts.  Unlike in *Corbett*, here the Clarklift and

IMH Reorganization Plans do not expressly cover *any* withdrawal liability claims, either as to the

debtors, Clarklift and IMH, or to their control group members.  While the Debtors were fully aware

of the Plan's claim and potential liability as to other control group members as early as October

2002, nine months prior to the confirmation of the Reorganization Plans, the Debtors chose not to

expressly include the claim along with an express release as to the debtors and all control group

members.  Moreover, unlike in *Corbett*, the relevant Reorganization plans do not expressly

discharge "any and all debts or claims" of third-party non-debtors, such as TMR Realty Co. and/or

Toyota Lift.

As such, it is clear that *Corbett* simply stands for the limited, narrow proposition that only express claims as to expressly identified non-debtors will be discharged in a bankruptcy proceeding and entitled to *res judicata* effect to ward off collateral litigation.  This narrow reading of *Corbett* is bolstered by reference to one of the decisions heavily relied on by the Second Circuit in its analysis – *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987).  Like *Corbett*, the Fifth Circuit's decision in *Shoaf* accepted a *res judicata* defense where the bankruptcy court's confirmation of a reorganization plan expressly released the non-debtor.  *Id.* at 1053.  However, the Fifth Circuit declined to extend its holding in *Shoaf* to a situation, such as the one in this case, "where a plan of reorganization does not contain a specific discharge of the indebtedness of a third-party."  *In re Applewood Chair Co.*, 203 F.3d 914, 920 (5th Cir. 2000).  The general release provision at issue in *Applewood Chair*, found to be insufficient as to the discharge of a third-party's indebtedness, is quite similar to the general release provision contained in Article 6.1 of the Reorganization Plans in this case.  The *Applewood Chair* release stated simply:

> The provisions of the confirmed plan shall bind all creditors and parties in interest, whether or not they accept the plan and shall discharge the *Debtor, its officers, shareholders and directors* from all claims that arose prior to Confirmation.

*Id.* at 919.  In declining to extend *Shoaf* to this type of release, the Fifth Circuit stressed that – unlike *Shoaf* – the release lacked a specific discharge of the non-debtor.  *Id.*

Similarly, in this case, the Clarklift and IMH Reorganization Plans contain no provision specifically releasing the Plan's independent withdrawal liability claims against TMR Realty Co. or Toyota Lift.  Instead, like the *Applewood Chair* release, the discharge provisions in the Reorganization Plans were narrowly drawn and limited to a release of the claims of the *Debtor* (as against both the debtor and others), but *do not include* a release of the debts and obligations of non-

44

debtors such as Defendants TMR Realty Co. and Toyota Lift.  As such, the Fifth Circuit's reasoning in refusing to give *res judicata* effect to the *Applewood Chair* release applies equally in this case to prevent TMR Realty Co. (and Toyota Lift, though Defendants do not contest it) from escaping its own <u>independent</u> legal obligation to pay the Plan's withdrawal liability assessment.

Accordingly, like their other asserted defenses, Defendants' attempt to avoid liability based upon the principle of *res judicata* is without foundation.  Given that the Plan has established its affirmative case and shown that Defendants TMR Realty Co. and Toyota Lift are jointly and severally liable as solvent control group members for the withdrawal liability incurred by a bankrupt control group member, i.e., Clarklift, and Defendants have failed to establish any viable defenses against such a collection effort, the Court concludes that summary judgment in favor of Plaintiffs is in order.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Plaintiffs' Motion for Summary Judgment and shall deny Defendants' Motion for Summary Judgment.  An Order accompanies this Memorandum Opinion.


Date:   March 31, 2006


                  /s/
COLLEEN KOLLAR-KOTELLY
United States District Judge